UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.:_____

MALEK JALAL,

        Plaintiff,

vs.

ELENA BAJIC, IVY EXEC, INC.,

        Defendants.

———————————————————————/



## COMPLAINT

COMES NOW, Plaintiff, Malek Jalal, pro se, based upon his personal knowledge as to himself, information and belief, alleges and avers as follows, and demands trial by jury:

### NATURE OF ACTION

1. This is an action brought by the Plaintiff, Malek Jalal (hereinafter "MJ") to recover, inter alia, compensatory and punitive damages suffered by him as a result of the Defendants systematic and intentional efforts to fraudulently dilute, exclude and oppress Plaintiff MJ, a minority shareholder in Ivy Exec, Inc. (hereinafter called "the Company").

### JURISDICTION AND VENUE

2. This action arises under the Constitution and laws of the United States and jurisdiction is proper pursuant to 28 U.S.C. §1332(a)(1) since complete diversity of the parties is present, in that Plaintiff resides in and is a citizen of the State of Florida and Elena Bajic (hereinafter "EB") resides in and is a citizen of New York and the amount in controversy

[1]

exceeds the sum or value of $75,000, exclusive of interest and costs.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) in that the Defendants reside or do business in the Southern District of New York and further, a part of the acts or omissions giving rise to the claims occurred within the State of New York. The Defendants are located in the State of New York and acts committed in furtherance of their scheme to defraud Plaintiff of his shares in the Company, his dividends and compensation lawfully owed to him occurred in New York and thereby venue is proper in the Southern District of New York.

### THE PARTIES

4. Plaintiff, MJ, aged 55, is an adult individual and a citizen of the State of Florida, residing presently at 15801 SW 137th Avenue, Miami, Florida 33177.

5. Defendant Elena Bajic, aged 41, is Chief Executive Officer and a Board of Directors member of Ivy Exec, Inc. in her individual capacity as a director, officer and CEO of Ivy Exec, Inc. is an adult individual and a resident of the state of New York, residing currently at 4 Boulder Brae Lane, Larchmont, New York 10538.

6. Defendant, IVY EXEC, INC., is a Delaware Corporation which maintains business offices and conducts business operations at 48 West 39th Street, 12th Floor, New York, New York 10018.

7. The Company is an internet technology company with a focus on a best in class professional network membership. The

[2]

Company maintains three offices around the globe, headquartered in Manhattan, New York. The Company maintains a full floor office in midtown Manhattan as well as a full team of technology software professionals. The Company also maintains operational offices in Novi Sad and Belgrade, Serbia. The Company boasts being a high growth company with 1,500,000 verified subscribers who are graduates from Ivy League universities or that have excelled in their career path.

8. The Company states that 75% of its subscribers are at director level or above in their respective corporations with substantial earnings of $200,000 to $2 million dollars plus per year. The Company states that 84% of the world's top universities have partnered with the Company to recruit the Company's members for advanced learning degrees.

## FACTUAL BACKGROUND AND ALLEGATIONS

9. MJ justifiably and detrimentally relied upon the Company, its Chief Executive Officer (hereinafter "CEO) and its Board of Directors, in its representations that they will uphold and protect this shareholder's equity in the Company.

10. Plaintiff MJ supported Defendant, EB since the inception of the Company with his expertise, his angel equity investment, his know how of digital networks, his time, his advisory and strategic implementation of the membership/subscriber concept, as well as bringing in investors with significant investment capital. EB knew nothing about starting and building a company and MJ worked tirelessly with her to devise, launch and develop the business.

[3]

11. Plaintiff is being squeezed out and was wrongfully terminated from the Company. As early as 2016 the majority shareholder commenced a systematic effort to unreasonably and oppressively squeeze out Plaintiff from the Company and to intentionally and maliciously deny him benefits from his equity in the Company, deny him benefits from his work in the company and from his permanent seat on the board of directors. EB further devised and is executing a scheme to defraud MJ from his 26.5% ownership of the company for less than two cents on the dollar and effectively eliminating him from the Company that he founded together with EB.

12. The Defendant, EB, in 2017 went so far in committing the fraud on MJ as to hire a valuation company to write a purported valuation of the Company that is so grossly unreasonable and understates the valuation of the Company so much, that her acts were fraudulent. Thereby, furthering her scheme to fraudulently force MJ to sell his stock at a price far below market value. In furtherance of her fraud upon this Plaintiff, EB filed a motion in New York Family Law Court asking the court to order the sale of MJ's stock in the Company to pay for his 2019 child support. (Prior to this time Plaintiff was current with all child support obligations). All the while EB has known that New York Law specifically maintains a provision for incarcerated individuals that allows the courts to make allowance to an incarcerated individual for back child support during their incarceration and in addition, that the family court only assessed child support based on the incomes of MJ and EB, not their assets.

[4]

13. The Defendant had a valuation created and presented to the New York Family Law Court to perpetrate her fraudulent scheme and wipe out MJ from the Company in a clear attempt single out Plaintiff to devalue, dilute and wipe out Plaintiff from the Company.

14. Defendant's acts and omissions give rise to Plaintiff's claims of shareholder oppression, breach of fiduciary duties, self dealing, negligent and intentional misrepresentation, fraud, wrongful discharge and unjust enrichment, and as such Plaintiff requests the Court to issue a temporary injunction to prevent an irreparable injury from occurring before the Court has a chance to decide the merits of the case.

## BACKGROUND FACTS AND ALLEGATIONS

15. Plaintiff, MJ, is a founder of the Company, angel investor and former husband to EB, a Defendant. Plaintiff is presently incarcerated at a minimum security federal prison camp in Miami, Florida. His release from the Bureau of Prisons is scheduled for April 11, 2021.

16. On or about January 2003, Plaintiff, MJ, met Defendant EB in New York City. Within a few months MJ and EB were living together. MJ was an entrepreneur having founded a series of businesses. In 2003 MJ was a senior Petrochemical trader working at ICC Industries in New York City. ICC is one of the largest private companies headquartered in New York, operating a multi-billion dollar trading and maufacturing business in the Petrochemical field. MJ operated a global portfolio of products on behalf of the company.

[5]

17. Prior to being a Petrochemical trader MJ had a series of businesses, a pertinent one to this matter was an internet company named Fashionfile.com. In 1997 MJ was the founder of Fashionfile.com an internet broadcasting and production business for the fashion industry, analogous to Ivy Exec, Inc. The company was the first worldwide online fashion network comprised of top industry professionals. The company was headquartered in London, United Kingdom, was venture capital funded and operated in 17 cities across the globe.

18. EB elected to start her own business based on the encouragement of MJ. EB's initial business plan was aimed at women wanting to return to the work force after having children, with many women taking hiatus from work to raise children and wanting to come back to the work force, EB selected this niche market to start her business. EB had no business experience and no money to fund the business and asked MJ not only to give her funding, but also to assist in developing the value proposition and getting funding for the business. EB was still unexperienced and MJ's direction, know how, ideas and experience proved to be extremely valuable at that time. In fact, the Company could not have been started and become a going concern without MJ.

19. MJ invested $188,000 over the course of 2006, and along with that seed money he provided his expertise and time in exchange for a permanent seat on the board of directors of the Company and a permanent strategic advisory role with the Company. This verbal contract was done between MJ and EB when the Company was formed. Mr. Djorge De Lukatela, EB's

grandfather, invested at the same time the sum of $3,000 as well as EB's mother Katarina De Lukatela investment in the amount of $5,000. All of this is memorialized in the company official documents and operating agreement.

20. For MJ's investment he received 35% percent equity in the company. Mrs. Lukatela received 5% percent equity and Mr. Djorge relinquised any equity and placed it as a gift to his granddaughter. Currently, Plaintiff owns 446,000 shares (founders) of common stock and an additional 1.5% (of the outstanding shares) in stock options to purchase additional shares at $0.75 cents per share totalling 26.5% of the Company stock.

21. Defendant, EB, paid in no capital to the company, MJ made the initial angel investment and the company was originally formed as a Delaware Limited Liability Corporation. The Company was reformed into a C Corp in 2009.

22. In or about 2007, Mr. Laurent Abergel, a close friend and colleague of MJ purchased 5% of the company for $100,000 at the urging of MJ. Mr. Abergel's company's investment was also memorialized in the same operating agreement and corporate documentation of the Company. At the time of Mr. Abergel's investment the Company had no more than 10,000 subscribers and revenues of $20,000 for the year of 2007. However, the benchmark valuation of $200 per member in the company was agreed upon by Mr. Abergel and the Company, thus giving the company a pre-money valuation of $2,000,000 (two million dollars) based upon his investment into the Company.

[7]

23. At the inception of the Company, (Ivy Exec, Inc.), MJ was instrumental in advising EB to focus the corporate mission on Ivy League graduates and on attracting a network of the best in class and brightest candidates globally. MJ also developed the name of the Company, Ivy Exec, Inc., www.ivyexec.com, and its subscription based revenue model. The idea of the network and subscription based model was the conception of MJ. Initially EB wanted to make the company an online employment agency for women getting back into the work force. MJ instructed EB that the legacy model of the brick and mortar business would not work and MJ and EB began to implement the subscription based model and build the network.

24. On December 31, 2008, MJ and EB were married in New York City and have since had two children together.

25. During the course of the Company's business, MJ served as a strategic and vital permanent member of the Board of Directors of the Company and as an advisor to EB. The Company was looked at by both MJ and EB as a family enterprise. MJ also worked in 2006 for a period of time, again in 2008 and again full time for a period of six months in October, 2014 to May 2015 as an employee of the Company as it was decided by MJ and EB that the Company needed his full time attention and expertise.

26. During MJ's last period at the Company, memorialized by the Board of Directors Minutes, while acting as Secretary of the Company and at the behest of EB and the Board of Directors, MJ spent hundreds of hours improving the business model and

[8]

preparing the company for its next phase. MJ spent in excess of one month of 2015 in Novi Sad, Serbia to rebuild the technology team and upgrade the business model in its entirety. MJ also spent a month in Belgrade, Serbia reviewing the Company operations and reorganizing the third operational office of the Company. MJ also recruited additional talent for the Company.

27. MJ was instrumental in taking the Company through its second strategic phase by shifting the resources of the Company towards new scalable objectives that would bring a larger return on investments to all shareholders and make the Company a major competitor to companies like LinkedIn, Glassdoor and other best in class research companies such as Nielsen Research.

28. In or about 2016, MJ sent an email addressed to the corporate attorney of the Company, John Freeman, Esq., as well as to the Board of Directors, and the CEO, EB, expressing his discontent with the Company's lack of transparency, specifically in the accounting department and certain accounting irregularities. MJ expressed his need to have full financial disclosure of the Company financials due to his ownership of one quarter of the company.

29. A few days later, contrary to the original verbal agreement, EB as a majority shareholder, fired MJ from the board of directors position without prior notice by using her majority shareholder position to bully, squeeze out, freeze out and oppress MJ from his permanent seat on the board of directors. Dividends and compensation have been withheld from MJ and he has been treated adversely different than other shareholders.

30. On March 23, 2017 after difficulties in the marriage, the divorce of MJ and EB was finalized in New York State Family Court.

31. From 2010 through 2014 MJ had started another company selling renewable energy. However, MJ was indicted federally for an offense regarding renewable energy credits, committed while running his renewable energy company in New Jersey and unrelated to the Company. MJ pled guilty to the offense and was sentenced to five years in federal prison. (Which is currently under appeal, and an evidentiary hearing is pending). Due to MJ's good conduct his sentence has been reduced to 39 months.

32. During MJ's entire time with the Company, EB had requested that MJ not take dividends from the company so that the Company would be able to grow and meet its financial commitments, thus returning his sweat equity back into the company in order to be repaid at a later time based upon the accrued valuation of the Company. MJ along with other board of directors members each received $5,000 per year for attending board meetings and establishing the direction of the company for the two years of 2014 and 2015. However, no dividends have been paid for the past 15 years based on the net income. MJ makes the claim that he is owed $540,000 from those years with interest.

33. EB made promises and representations to MJ that he would always be next in line to EB in the management of the company (due to the fact that the Company could not have been started without him) and that MJ would be part of the business for life as long as the Company was a going concern. EB made

certain promises, statements and representations which served to induce MJ to devote his money, his time, his resources and his expertise to the Company since its inception in 2006. After the marriage deteriorated and EB determined that she no longer needed MJ, she methodically began a process of squeezing out MJ by purging him from the company and attempting to obtain MJ's shares in the Company by fraud and artifice.

34. Defendant, EB, in furtherance of her scheme to defraud MJ of his shares of the company, filed a motion with the family court of New York in order to weaponize the court to have the court order his shares to be sold for payment of his 2019 back child support. However, Defendant has known that New York law specifically has a provision for incarcerated individuals that allows the court not to assess back child support to an individual during their time of incarceration. This has been done in furtherance of Defendant's scheme to obtain many millions of dollars of Plaintiff's stock in the Company at a penny on the dollar by fraudulently devaluing the Company.

35. In a telephone conversation between MJ and EB in 2017, prior to Plaintiff entering federal prison, Defendant stated that she would do "all in her power" so that Plaintiff "would not see a red cent" from the Company. Defendant has continued to engage in a scheme to defraud Plaintiff of his shares of stock in the Company, his dividends and just compensation owed to him.

## COUNT ONE - FRAUD

36. Plaintiff incorporates the allegations of paragraphs 1-35 as if fully set forth herein.

37. EB and other officers, directors and investors of the Company did conspire, combine and confederate to singularly defraud Plaintiff of his stock in the Company, his permanent board of directors seat and just compensation owed to him.

38. After the Plaintiff began raising concerns about accounting irregularities, the Defendants began to execute their scheme to defraud Plaintiff of his permanent board of directors seat, his stock shares in the Company and his just compensation owed to him.

39. First, EB, being the majority shareholder, did hold a board of directors meeting and influence the board of directors to fire Plaintiff without notice to Plaintiff.

40. Second, EB, as CEO of the Company did file motions in New York State Family Law Court requesting that court to order the sale of Plaintiff's stock shares for payment of back child support, while knowing that New York State Law specifically holds a provision that does not require incarcerated parents to pay back child support while incarcerated.

41. Third, EB, as CEO of the Company, did cause to be sent a letter to Plaintiff offering to purchase Plaintiff's shares in the company at a price so far below the market value that it would defraud Plaintiff out of his shares in the company at that price.

42. Fourth, EB, as CEO of the Company, did cause Valuation Shop, Inc. to write a valuation of the company that is below the market value determined 2007 when the company had ten thousand subscribers and $20,000 of revenues that year and EB agreed on a

[12]

valuation of $200 per subscriber/member at that time. Today the company has one and half million subscribers/members with revenues of in excess of $5,000,000 per year. At the valuation that Valuation Shop, Inc. purportedly issued (based on the letter written to Plaintiff by EB), the Company would not even be able to be a going concern and is now valued far below what Mr. Abergel paid in 2007. Mr. Abergel's (an accredited investor) original investment in 2007 was based on a valuation of two million dollars ($200 per subscriber/member), in which he purchased 5% of the common stock. The offer to buy Plaintiff's shares by the CEO and the Company and its Investors is fraudulent in nature by its attempt to obtain Plaintiff's shares at a price so far below the market value and is a "squeeze out."

43. Fifth, EB, as CEO of the Company, did cause Valuation Shop, Inc. to write a valuation of the Company that so grossly undervalues the Company and fails to account for the Company membership subscriptions (SAAS Model), its database mining business, its market research, its mentoring, webinars, or to give value to its most important asset the "network", its core business, without which, the business would not exist, and is fraudulent from the beginning.

44. Sixth, EB, as CEO and co-founder of the Company with MJ, knew that the valuation she ordered to be done is a fraud because the CEO restricted the valuation company and made it focus the entire business on a legacy recruiting "brick and mortar" model that has never been the mission of the Company. The Company mission from the beginning was as a leading edge

[13]

technology company developing and maintaining a database and network of the most well educated and highest earning individuals in the world. As of 2019, the Company's network numbers 1.5 million verified (a strict verification process) members. The information the Company maintains about is members is the most valuable asset of the Company and the valuation put forth by EB and Valuation Shop, Inc. does not even show a valuation from this as of 2017. This valuation is the equivalent of valuing Facebook without considering its 2 billion members. It is absurd and a fraud.

45.    Seventh, EB intentionally caused the fraudulent valuation to be made with an offer to purchase MJ's stock at an additional 70% discount from the fraudulent valuation. (Based upon numbers provided by the Defendant, as seen in Exhibit "C"). However, the Company stated in the Valuation Shop's report to have "experienced rapid growth." The purported valuation states rapid growth but does not give a valuation consistent with that growth.(In 2015 Microsoft paid $61 per subscriber to purchase LinkedIn for a total of $26.5 Billion dollars for its Network of members/subscribers). Based on a valuation of $61 per member/subscriber and a database of 1.5 million members, that gives the Company a conservative value of $91,500,000 dollars. The valuation presented to MJ by the Company states it is a "rapid growth" company and is in an industry that is "projected to increase annuallized 17.8% ... to 2018." Yet, the valuation prepared for the Company values the company at 0.59 times earnings, not even enough to be a going concern.

46. Eighth, EB wrote on August 13, 2019 to the Plaintiff that "one of the existing investors in Ivy Exec has put a proposal to purchase your shares in Ivy Exec. They are offering $275,000 to purchase your 446,400 shares of Ivy Exec." EB stated that the offer was valid for 14 days and she stated "For the sake of the children, I hope you will accept this offer." EB also stated that the value of the common stock of Ivy Exec would be at $1.029, "essentially giving a book value for your shares of $459,345." That valuation is not even at the level given to Mr. Abergel in 2007 when the Company had no revenues and less than ten thousand members. EB also attempted to play on Plaintiff's feelings for his children. However, Defendant, EB, has a compensation package that puts her in the top 1% income bracket and has no immediate need for child support. See Exhibit "A."

47. Ninth, On October 17, 2019, EB caused the Company Controller Jessica Anghel to write to Plaintiff using the U.S. Mail, stating that "we wish to notify you that Ivy Exec Inc and its current investors, are still offering you an opportunity to sell you [sic] shares in Ivy Exec." Once again, EB, the Company and its investors attempted to perpetrate fraud on this Plaintiff by trying to obtain Plaintiff's shares at a price that is many millions of dollars below the value of the company in its current state. See Exhibit "B." EB has used the Company funds to squeeze out and unjustly enrich herself and her proxies.

[15]

48. Defendant, EB, used Ivy Exec, Inc. as her alter ego where EB as a majority shareholder of the Company, exerted invasive control over the Company with a complete disregard for the traditional corporate boundaries by unjustly singling out the Plaintiff, MJ, with an intent to dilute him and eliminate MJ from the Company. EB did this by using corporate funds in her scheme to devalue and dilute MJ by using the purported report purchased from Valuation Shop, Inc., that is grossly unreasonable, in furtherance of her fraud. This coupled with the offer letter from the Company to purchase MJ's shares in the Company demonstrate EB's fraudulent intent and use of the Company as her alter ego.

49. Based upon similar company valuations, had such a valuation methodology been utilized for Facebook, Snapchat, Twitter, Uber, LinkedIn, Glassdoor or numerous other known internet companies, those companies would actually have a negative valuation instead of being worth tens of billions of dollars. The valuation ordered by EB and put forth by Valuation Shop, Inc. is viewed in context to other internet technology companies, the valuation is analogous to McDonalds being valued only for the sales of its French Fries, or, Facebook being valued only for its Instant Messenger. This highlights the fraud being perpetrated on Plaintiff. Based upon estimated values of the Company subscribers and revenues, Plaintiff and others believe the Company to be worth in excess of $91.5 million dollars for its network of subscribers alone, its main asset, instead of the grossly unreasonable valuation of 0.59 times

earnings offered by the Defendants. This provides motive for the Defendants to perpetrate fraud upon this Plaintiff in order to obtain Plaintiff's 26.5% ownership in the Company and Plaintiff's shares to be worth a minimum of $23.79 million dollars. However, Defendants are attempting to squeeze out Plaintiff for $275,000.

50. Wherefore, Plaintiff prays this Honorable Court grant relief as this Court may deem just and equitable.

## COUNT TWO – BREACH OF CONTRACT AND WRONGFUL TERMINATION

51. Plaintiff incorporates the allegations of paragraphs 1-50 as if fully set forth herein.

52. The Defendants did breach a long-standing verbal contract with the Plaintiff to be a permanent director of the Company by removing him from his position as a director of the Company in 2016, and further in which Plaintiff received no compensation from the Company. The Plaintiff served on the board of directors, as well as in many other capacities with the Company from its inception. No question exists that the Plaintiff served on the board of directors for eleven (11) years. Based on the evidence at hand, it demonstrates that the Plaintiff did have a verbal contract with the company as a permanent member of the board of directors because it was a family enterprise. The Defendant, EB, did commit tortious interference with the verbal contract that had been in place for over eleven (11) years.

53. The Defendant did wrongfully discharge Plaintiff from his permanent board of directors position when she held a

[17]

special board of directors meeting in order to discharge Plaintiff after Plaintiff raised accounting irregularities with the board of directors and the Defendant.

54. Wherefore Plaintiff prays this Honorable Court grant relief as this Court may deem just and equitable.

## COUNT THREE - BREACH OF FIDUCIARY DUTIES AND SELF-DEALING

55. Plaintiff incorporates the allegations of paragraphs 1-54 as if fully set forth herein.

56. The Defendant has engaged in a systematic effort to deny Plaintiff rights and benefits flowing from his status as a board of directors member and as a minority shareholder in order to obtain his stock and a larger ownership position in the Company by including but not limited to the following:

56.1 The Defendant refused and failed to declare a dividend after inducing Plaintiff for many years not to take a dividend, all the while planning to cheat Plaintiff out of any dividends;

56.2 The Defendant discharged Plaintiff from his position and duties wrongfully and in contravention of a long-standing verbal contract with the Company;

56.3 The Defendant deprived Plaintiff of his permanent position as director of the Company.

56.4 The Defendant usurped corporate opportunities;

56.5 The Defendant weaponized the family court to squeeze out Plaintiff from all participation in the Company and has denied MJ a fair return on his investment and compensation for his services and therefore, have breached fiduciary duties owed to the Plaintiff;

[18]

56.6 The Defendant took actions designed to take Plaintiff's stock and harm Plaintiff financially.

56.7 Defendant committed Shareholder Oppression when she caused a letter to be sent to Plaintiff offering to buy his shares in the company for seventy percent of a purported valuation that Plaintiff avers is a fraudulent and artificial price made up by a company hired by the Defendant with the specific intent to devalue Plaintiff's stock in the Company.

56.8 The Defendant treated Plaintiff differently than other shareholders in order to deprive him of his rights as a shareholder and board of directors member.

56.9 The Defendant expropriated the economic value and voting power of Plaintiff to the majority shareholder and her proxies.

57. Plaintiff was harmed by Defendant in the form of substantial monetary and non-monetary damages as more fully set forth in this complaint.

58. Wherefore Plaintiff prays this Honorable Court award damages, court costs, any fees, and such relief as this Court may deem just and equitable.

## COUNT FOUR - SHAREHOLDER OPPRESSION

59. Plaintiff incorporates the allegations of paragraphs 1-58 as if fully set forth herein.

60. The Defendant, Elena Bajic in her respective position as CEO, Director and Majority Shareholder in the Company, had a fiduciary duty of loyalty, care, good faith and fairness toward

minority shareholders of the Company. The Defendant's fiduciary duties required her to act with the utmost good faith, care, fairness and loyalty in transacting corporate affairs with minority shareholders.

61. The Defendant's fiduciary duties required her to devote herself to the corporate affairs with a view to promote the common interests and not her own. The Defendant cannot utilize her position to obtain any personal profit or advantage other than that enjoyed also by her fellow shareholders.

62. The Defendant individually stood to benefit from her actions and decisions regarding the employment of Plaintiff and her attempt to obtain Plaintiff's stock in the corporation.

63. Due to the self-dealing by the Defendant, individually, the Defendant has breached her fiduciary duties owed to the Plaintiff by, inter alia, denying him the right to participate in the benefits of the Company.

64. The Defendant has knowingly and intentionally breached and failed to perform her respective fiduciary duties by, inter alia, subjecting Plaintiff to oppressive, arbitrary, unreasonable, unfair, and wanton actions undertaken in contravention of their respective fiduciary duties.

65. The Defendant engaged in a systematic effort to oppress and exclude the Plaintiff from having any meaningful role in the Company.

66. The Plaintiff was harmed by the Defendant in the form of substantial monetary and non-monetary damages as more fully set forth in this complaint.

[20]

67. Wherefore, Plaintiff prays this Honorable Court grant such relief as the Court deems equitable and just.

### COUNT FIVE - INTENTIONAL MISREPRESENTATION

68. Plaintiff incorporates the allegations of paragraphs 1-67 as if fully set forth herein.

69. The Defendant intentionally misrepresented that Plaintiff would maintain a permanent position on the board of directors as a director of the Company. After eleven (11) years of service to the Company and representations that MJ would be a permanent board of directors member, EB fired MJ and further denied MJ any due compensation.

70. The Defendant intentionally misrepresented that Plaintiff regarding promises made at the start of the business and would enjoy a permanent position with the company and be in next in line in management to the CEO.

71. Wherefore, Plaintiff requests this Honorable Court grant all relief that is just and equitable.

### COUNT SIX - LIQUIDATED DAMAGES, FEES AND BACK COMPENSATION

72. The foregoing paragraphs 1-71 are hereby incorporated by reference.

73. Plaintiff seeks four (4) years of compensation at $5,000.00 per year, for his position on the board of directors plus reasonable interest, court costs of $505.00 and back employment compensation for the years of 2006 through 2015.

74. Plaintiff request this Honorable Court to ORDER MJ returned to his position as a board of directors member to serve on the board of directors at MJ's discretion.

75. Plaintiff requests this Honorable Court to award half of the Company to MJ due to the intent of the parties ab initio and due to the fraud perpetrated upon MJ to fraudulently obtain Plaintiff's stock in the Company, and all other compensation that is just and equitable to penalize Defendant for this behavior.

## COUNT SEVEN - PUNITIVE DAMAGES

76. Plaintiff incorporates the allegations of pagragraphs 1-75 as if fully set forth herein.

77. Based on the foregoing, Plaintiff requests the Court to award punitive damages in the amount of $100,000.00 for every year that Plaintiff has been invested in the Company or as the Court deems equitable and just.

## CONCLUSION

78. Plaintiff incorporates the allegations of paragraphs 1-77 as if fully set forth herein.

79. For the reasons set forth herein, Plaintiff requests this Honorable Court find for the Plaintiff and;

    a. Award a temporary and permanent injunction from the Company diluting or otherwise devaluing Plaintiff's stock or from pressuring or otherwise requiring Plaintiff to sell his shares;

    b. Find for the Plaintiff that Defendants committed fraud;

    c. Find for the Plaintiff that Defendant breached its contract and wrongfully terminated Plaintiff;

[22]

d. Find for the Plaintiff that Defendant committed Shareholder Oppression;

e. Find for the Plaintiff that the Defendant squeezed out Plaintiff from the Company;

f. Find for the Plaintiff that Defendant committed Tortious Interference with a verbal contract.

## DEMAND FOR JURY TRIAL

80. Based upon the foregoing, Plaintiff respectfully demands a jury trial for all allegations in which a dispute or controversy arises.

## PRAYER

81. Wherefore, Plaintiff requests this Honorable Court find in favor of the Plaintiff and find the Defendants liable jointly and severally and award fees as specified herein.

Respectfully Submitted,

Malek Jalal
Reg. No. 76267-061
Miami Federal Prison Camp
P.O. Box 779800
Miami, Florida 33177

**E X H I B I T   A**

# Elena Bajic

**From:**       elena@ivyexec.com

**Sent Date:**  Tuesday, August 13, 2019 7:19 AM

**To:**         MALEK JALAL (76267061)

**Subject:**    Hello

Dear Malek,

I hope this email finds you well. I am writing to share some good news – one of the existing investors in Ivy Exec has put a proposal to purchase your shares in Ivy Exec. They are offering ▮▮▮▮▮▮ to purchase your 446,400 shares of Ivy Exec. As you know we had an external valuation completed less than 12 months ago by Preferred Return an independent third party valuation firm. They valued a share of common stock of Ivy Exec Inc at $1.029, essentially giving a book value for your shares of ▮▮▮▮▮▮ The current proposal would give you immediate liquidity at ▮▮▮▮▮▮▮▮▮▮

This liquidity event would allow you to cover both your child support obligations, and to start paying off some of the restitution you owe to the federal government. As a single mother, raising two boys in Westchester, I am counting on the funds that the court awarded me through child support. I truly hope you will consider this offer, and do the right thing.

This offer will be valid for 14 days. If I don't hear back from you by August 27th, you will have declined this offer to sell your shares in Ivy Exec. For the sake of the children, I hope you will accept this offer.

Take care,
Elena

# Company Overview

## Business Description

Ivy Exec, Inc. ("Ivy Exec") is an Internet-based professional ████████ for consulting, investment banking and technology focused professionals. The Ivy Exec platform provides content and services to help professionals progress in their careers. This includes job search, mentorship, career advisory, and educational services. Ivy Exec focuses on the mid-late stage professional, not entry level like most other online recruitment sites. Currently, there are about ████████ ██ ████████ part of the ████████████████ with ██% being C Suite, ████████████ Directors, Managers or ████████████.

## Management Team

Elena Bajic
*Founder and Chief Executive Officer*

Elena is the founder & CEO of Ivy Exec, a membership-based career community of over one million global business leaders████████████████████████████████, redefining the online career landscape with innovative service offerings such as its Mentor Network. ████████████████████████████████████████ ████████████████████████████Prior to founding Ivy Exec, Elena worked with global firms and brands, such as Nivea and Swatch Watch, in marketing, advertising and international brand development. She is a regular contributor to Forbes and US News, and has been featured in Bloomberg Businessweek, Crain's New York Business, USA Today, and Inc. Magazine. She has appeared on CNBC's 'Squawk on the Street' and Reuters' Entrepreneur's Edge. She earned her MBA from Columbia Business School and her B.A. from Brown University.

Alex Baranpuria
*Vice President, General Manager & Co-Founder*

Founding member and Vice President & General Manager for Ivy Exec, an online membership community of 900,000 high caliber business professionals. Prior to joining Ivy Exec in 2008, Alex completed highly acclaimed Teach for America program, a national service corp of top college graduates who commit two years to teach in under-resourced regions to close the educational achievement gap. Received BS degree from Duke University in 2006.

## Industry Description

The Online Recruitment Sites industry has experienced significant growth since the 2000s as the number of services conducted online has grown. The internet has become increasingly prominent in consumers' everyday lives, which has subsequently driven the use of online recruitment sites by both job candidates and employers. The industry has been further boosted over the five years to 2018 as the job market improved. Industry revenue expanded 17.3% and 13.8% in 2016 and 2017, respectively, as the unemployment rate dropped and the number of mobile devices with internet connection grew rapidly. Consequently, industry revenue is projected to increase an annualized 17.8% to $7.7 billion over the five years to 2018, including growth of 12.6% in 2018.

The low costs associated with starting an online company have led many new operators to the industry. However, existing industry players have increased their market share through the purchase of smaller niche players and organic growth of their user bases. Incumbent operators hold a significant competitive advantage in developing brand names and high market share concentration, which has made it difficult for new operators to gain significant market share. Nonetheless, low barriers to entry and strong demand for professional and technical recruiting have enabled some niche job boards to succeed within their

4

# Ivy Exec, Inc.
# Profit and Loss
### January 2015 - December 2018

| | Jan - Dec 2015 | Jan - Dec 2016 | Jan - Dec 2017 | Jan - Dec 2018 |
|---|---|---|---|---|
| **Income** | | | | |
| Higher Education | $ 777,471.00 | $ 972,899.00 | $ 1,227,192.52 | $ 1,286,346.00 |
| Recruitment | $ 819,065.00 | $ 1,122,023.23 | $ 1,562,912.80 | $ 2,019,465.50 |
| Membership | $ 2,458,658.51 | $ 2,044,793.00 | $ 1,687,411.03 | $ 1,757,236.00 |
| **Total Income** | $ 4,055,194.51 | $ 4,139,715.23 | $ 4,477,516.35 | $ 5,063,047.50 |
| **Cost of Goods Sold** | $ 584,417.64 | $ 545,566.73 | $ 654,694.68 | $ 817,443.56 |
| **Gross Profit** | $ 3,470,776.87 | $ 3,594,148.50 | $ 3,822,821.67 | $ 4,245,603.94 |
| **Expenses** | $ 368,198.27 | $ 423,266.63 | $ 450,053.33 | $ 476,562.36 |
| Genera & Administrative | $ 588,019.83 | $ 480,168.58 | $ 511,295.96 | $ 532,147.25 |
| Payroll & Related | $ 1,214,706.00 | $ 1,465,000.06 | $ 1,479,047.55 | $ 1,732,355.71 |
| Professional Fees | $ 51,602.31 | $ 62,173.25 | $ 67,765.49 | $ 83,965.32 |
| Sales & Marketing | $ 1,090,524.41 | $ 1,076,915.24 | $ 894,365.62 | $ 855,981.48 |
| Technology | $ 139,686.88 | $ 178,576.95 | $ 144,883.96 | $ 220,967.63 |
| **Operating Expenses** | $ 3,084,539.43 | $ 3,262,834.08 | $ 3,097,358.58 | $ 3,425,417.39 |
| **Total Expenses** | $ 3,452,737.70 | $ 3,686,100.71 | $ 3,547,411.91 | $ 3,902,039.50 |
| **Operating Income** | $ 18,039.17 | -$ 91,952.21 | $ 275,409.76 | $ 343,564.44 |
| **Other Income** | $ 18,989.01 | -$ 1,310.64 | $ 3.89 | $ 3.89 |
| **Net Income** | $ 37,028.18 | -$ 93,262.85 | $ 275,413.65 | $ 343,568.33 |

# IVY EXEC

49 West 38ᵗʰ Street Floor 12A
New York, NY 10018
888-551-3444

October 17, 2019

Dear Malek,

In follow up to the offer letter you received on August 13, 2019, we wish to notify you that ▉▉▉▉ ▉▉▉▉▉▉▉▉ its current investors, are still offering you an opportunity to sell you shares in Ivy Exec. As communicated to you on August 13, 2019, our investors have put a proposal to purchase 446,000 shares of common stock for $275,000.

Please do let us know if you are interested in taking advantage of this liquidity opportunity.

Kind regards,

*Jessica Anghel*

Jessica Anghel

Controller, Ivy Exec

release after thirty-nine (39) months.

## PETITIONER HAS THE ABILITY TO PAY HIS CHILD
## SUPPORT OBLIGATION WHILE HE IS INCARCERATED

12.    The fact that Petitioner is incarcerated, as was expected at the time he entered into the Stipulation and agreed to pay child support of $2,500.00 per month plus 40% of add-ons, and allegedly has no income as a result of his imprisonment, also fails to constitute a substantial change in circumstances.

13.    At the time of the Stipulation and Judgment of Divorce, Petitioner had earned little to nothing for some time as a result of his criminal conduct. However, Petitioner did have an equitable interest in the marital residence we owned. Petitioner's equitable interest in the marital residence was used to pay child support arrears through the end of 2016 and to pre-pay his child support obligations for two (2) years until December 31, 2018.

14.    After deducting the arrears and the pre-payment of child support from Petitioner's share of his equitable interest in the marital residence, I paid to Petitioner on March 30, 2017 the remaining balance of Two Hundred Seven Thousand ($207,000.) Dollars due and owed to Petitioner. The funds were wired by my lawyer outside of the United States to Petitioner's sister in Lebanon, as per his request.

More important is the fact that Petitioner recently has been offered the sum of Two Hundred Seventy-Five Thousand ($275,000.) Dollars for his Four Hundred Forty-Six Thousand (446,000) shares of Ivy Exec Inc. I advised Petitioner of this offer on August 13, 2019. Petitioner has failed to respond to this offer which would provide him further funds for the

4

support of our children during the period of his incarceration. This offer is still available to him.

16.     Petitioner has available to him at least Two Hundred Seventy-Five Thousand ($275,000.) Dollars with which to pay child support. Approximately One Hundred Thousand ($100,000.) Dollars of these funds will cover child support for the period commencing January 1, 2019, when the pre-paid child support reached $0.00, through March 2021 when Petitioner is scheduled to be released; leaving Petitioner with approximately One Hundred Seventy-Five Thousand ($175,000.) Dollars available to him upon his release, plus any additional funds he has remaining from his interest in the marital residence and from any funds Petitioner may have.

17.     In short, there has been no substantial change of circumstance in Petitioner's financial circumstances between the time of the making of the Stipulation and the issuance of the Judgment of Divorce, and the filing of the current Petition by the Petitioner seeking a modification of his child support obligations.

WHEREFORE, it is respectfully requested that Petitioner's Petition for Modification be dismissed with prejudice and for such other and further relief as this Court deems appropriate.

_____
ELENA BAJIC, Respondent

Sworn to before me this
17th day of October 2019.

_____
Notary Public

OKEY ARIZOR
Notary Public, State of New York
No. 01AR6189659
Qualified in Bronx County
Commission Expires June 30, 2020

5

Exhibit A

E X H I B I T   B

# Capitalization Table

| Class of Security | Outstanding | Basis | Coupon | Tier | Preference | Claim |
|---|---|---|---|---|---|---|
| Common Stock | 1,530,000 | $0.00010 | | 1 | | |
| Expected Option Grants | 100,000 | $1.02900 | | 1 | | |
| ~~████████~~ | 326,500 | $0.75000 | | 1 | | |
| Series Seed | 300,000 | $0.75000 | 5.00% | 2 | 1.0x multiple, nonparticipating | $225,000 |
| | 2,256,500 | | | | | $225,000 |

**E X H I B I T   C**

## Result of Method

By summing the amounts allocated to the target security in the option pricing tables above, we derived the allocated value:

| Security Class | Shares Outstanding | Allocated Value |
|---|---|---|
| Common Stock | 1,530,000 | $1.47 per share |

# Discounts and Premiums

## Marketability Discount

There is usually no market for the common equity of all but the latest-stage private companies. Based on our research and analysis, we applied a discount for lack of marketability of 30.00%. Further workbooks detailing the study of this assumption, including put option calculations, are presented in the appendices.

Assuming the following, after discounting for marketability, the aggregate value of the subject securities results in a per-share value of:

| Security | Shares Outstanding | Discounted Value |
|---|---|---|
| Common Stock | 1,530,000 | $1.029 per share |

OFFER   0.58/SHARE

# Valuation Result

## Fair Market Value Indicated

On the Appraisal Date, our conclusion of the fair market value ("FMV") of one share of Common Stock of Ivy Exec, Inc. on a closely-held, minority basis was:



## Certification

We hereby certify that the members of our engagement team have no direct or indirect financial interest in the property that is the subject of this assignment, nor do they have any direct or indirect personal interest with respect to the property or parties involved in the assignment. Some of the undersigned individuals have personally interviewed management of the Company. Neither our employment nor our compensation in connection with the report is any way contingent upon the recommendations reached or value estimated, and this report sets forth all of the assumptions and limiting conditions affecting the analysis. This report is intended to have been prepared in accordance with the guidelines recommended by AICPA's Statement on Standards for Valuations No. 1 and AICPA's practice aid, Valuation of Privately-Held Company Equity Securities Issued as Compensation. It also adheres to the requirements of the Principles of Appraisal Practice and Code of Ethics of the Business Valuation Standards of the American Society of Appraisers, and the Uniform Standards of Professional Appraisal Practice as set forth by the Appraisal Standards Board of the Appraisal Foundation. To the best of our knowledge and belief, all statements of fact contained in this report are true and correct.

March 28th, 2019

use this

Malek Jalal
c/o Carole Seikaly
4401 Island Road
Miami, FL. 33137

$0.50
US POSTAGE
FIRST-CLASS
062S001169210
FROM 33127



$1.00
US POSTAGE
FIRST-CLASS
062S001169210
FROM 33127

$1.00
US POSTAGE
FIRST-CLASS
062S001169210
FROM 33127



$1.00
US POSTAGE
FIRST-CLASS
062S001169210
FROM 33127

**FROM:**

D Baker
SMGQ Law
218 NW 24th St
Miami, FL 33127


ZIP3
SDNY


RECEIVED
DEC 30 2019
PRO SE OFFICE

**TO:**

Clerk of Court, Pro-Se Intake
Southern District of New York
500 Pearl Street
New York, NY 10007


1002


10007



U.S. POSTAGE PAID
USPS RETAIL GND
33128
MIAMI, FL
DEC 19 19
AMOUNT
$11.17
R2304P118996-15

USPS TRACKING® NUMBER